UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

UNITED STATES OF AMERICA      )
     )
     v.      )     Case No. 3:11-CR-00008 JD
     )
VERTIN LOPEZ-SANCHEZ      )

**MEMORANDUM OPINION AND ORDER**

Now before the Court is the Defendant's motion to suppress [DE 23] filed by counsel on

May 17, 2011. For the reasons discussed below, the Defendant's motion is DENIED.

**Background**

On September 9, 2010, Mishawaka Police Department Captain Daniel Gebo and Sergeant

Robert Reppert conducted a knock-and-talk investigation at the Defendant's home–801 Berlin

Avenue, Mishawaka, Indiana.[1] When officers knocked, the Defendant, Vertin Lopez-Sanchez,

answered the door and allowed them to enter. The officers advised Mr. Lopez-Sanchez that they

had received a complaint about narcotics activity, and sought permission to search for evidence

of "drug activity" and "dealing paraphernalia". Mr. Lopez-Sanchez verbally consented to a

search, and volunteered that he had a couple of guns in his bedroom.

Officers produced a written consent-to-search form and read it to Mr. Lopez-Sanchez.

Although Mr. Lopez-Sanchez initially stated, "sometimes I don't understand", officers offered to

explain further anything he did not understand. Officers read Mr. Lopez-Sanchez the form,

which advised him that he had the right to have officers obtain a warrant, that he could refuse to

consent to a search, that he could consult with an attorney prior to consenting to a search, and

---

[1] Counsel have stipulated to the admissibility of audiotapes of the search and interview
occurring on September 9, 2010. [DE 32].

that he had the right to have an attorney appointed if he could not afford one. When asked if he understood those rights, Mr. Lopez-Sanchez said that he did not understand "a couple things". Officers then clarified that they were looking for drug activity, said that they did not have a search warrant, clarified that they were not concerned about minimal drug infractions, and asked permission to look around the house for evidence of "drug activity". Officers twice clarified that Mr. Lopez-Sanchez could tell them to stop searching at any time and thoroughly explained the search procedures to him. Captian Gebo then asked Mr. Lopez-Sanchez if he was going to consent to a search. Mr. Lopez-Sanchez replied "yes" and signed the consent-to-search form. Captain Gebo then asked Mr. Lopez-Sanchez where the guns were located, and Mr. Lopez-Sanchez pointed him to the relevant locations in the house.

Throughout the encounter, officers had little trouble understanding Mr. Lopez-Sanchez, who stated that he had lived in the United States for 17 years. They chatted with him about the ongoing construction project on his street, about his sons' ages and activities, about his work history at Scott Brass, and about his dog. Several times, Mr. Lopez-Sanchez mentioned to officers that he was supposed to go pick up his uncle. However, he never requested that they stop their search and he never expressed an intent to leave. Likewise, officers never told Mr. Lopez-Sanchez that he could not leave; they said only that they would be done soon.

Officers found no evidence of drug activity in Mr. Lopez-Sanchez's house. After their initial search was complete, officers again asked Mr. Lopez-Sanchez for consent to search his vehicles. Mr. Lopez-Sanchez stated that he did not mind, and that one of his trucks was unlocked. He also removed his dog from his detached garage so that officers could search his Ford F-150 club-cab truck in peace.

Sergeant Reppert opened the rear, driver's-side door of that truck to search the passenger compartment, while Captain Gebo searched the passenger's side of the passenger compartment. Sergeant Reppert testified that upon opening the rear door on the driver's side, he saw the wooden butt of what he thought was a gun protruding from underneath the rear, driver's-side seat. Reppert testified that he advised Gebo that he found a gun, and, in order to render it safe, pulled the short, pump-action shotgun with a pistol grip from under the seat. Reppert also recovered a plastic bag containing shotgun shells from under the seat.

Reppert testified that he could not see the length of the shotgun's barrel until he had removed it from the truck. But as soon as he removed it, he suspected that it might be an illegal weapon because its barrel was too short. He testified that he was 60 percent sure that the weapon was unlawfully short. Reppert contacted another police officer, who came to the scene and measured the gun. Officers determined that the shotgun's barrel was unlawfully short, and took it with them when they left Mr. Lopez-Sanchez's house. No other evidence was seized from Mr. Lopez-Sanchez's house, and he was not arrested at that time.

On January 13, 2011, the grand jury returned a one-count indictment charging Mr. Lopez-Sanchez with knowingly possessing a short-barreled shotgun not registered to him in the National Firearms Registration and Transfer Record in violation of 26 U.S.C. §§ 5861(d) and 5871. On May 17, 2011, the Defendant filed a motion to suppress the shotgun [DE 23], to which the government responded on June 14 [DE 28], and the Defendant replied on June 21 [DE 29]. On July 27, 2011, the Court held a hearing on the Defendant's motion, at which Reppert testified for the government.

**Discussion**

The Government bears the burden of proving by a preponderance of the evidence the admissibility of evidence—in this case that the Defendant's Fourth Amendment rights were not violated during the incident in question. *United States v. Matlock*, 415 U.S. 164, 177, 177 n.14 (1974) (requiring that the Government bear the burden of demonstrating the admissibility of evidence resulting from a warrantless search by a preponderance of the evidence); *see also Lego v. Twomey*, 404 U.S. 477, 488-89 (1972).

Defense counsel claims that the officers' conduct was unlawful in three respects. First, defense counsel argues that Mr. Lopez-Sanchez's difficulties with the English language render his consent to search invalid. Second, counsel suggests that Mr. Lopez-Sanchez sought to terminate his consent to search when he stated that he was supposed to leave to pick up his uncle. And third, counsel claims that the shotgun was unlawfully seized from the truck because it was not within the scope of the consent to search, and that the shotgun was not subject to a lawful plain-view seizure because Reppert did not see its length before he removed it from under the seat.

**I. The Voluntariness of the Consent to Search**

The first issue before the Court is whether Mr. Lopez-Sanchez's consent to search was voluntary. The burden is on the Government to prove, by a preponderance of the evidence, "that someone who consents to a search does so freely and voluntarily." *United States v. Saadeh*, 61 F.3d 510, 518 (7th Cir. 1995) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973)). "The existence of voluntary consent is a question of fact to be determined based on the totality of the circumstances." *United States v. King*, 627 F.3d 641, 648 (7th Cir. 2010) (quoting *United*

*States v. Figueroa-Espana*, 511 F.3d 696, 704 (7th Cir. 2007)).  In making this determination,

among the relevant factors to consider are:

> (1) the person's age, intelligence, and education, (2) whether he was advised of his
> constitutional rights, (3) how long he was detained before he gave his consent, (4)
> whether his consent was immediate, or was prompted by repeated requests by the
> authorities, (5) whether any physical coercion was used, and (6) whether the
> individual was in police custody when he gave his consent.

*United States v. Villegas*, 388 F.3d 317, 325 (7th Cir. 2004) (quoting *United States v. Raibley*,

243 F.3d 1069, 1075-76 (7th Cir. 2001)).

Many of these factors support the government's argument that Mr. Lopez-Sanchez

consented to a search voluntarily.  Mr. Lopez-Sanchez's middle age and apparent intelligence

supports a finding that he knew what he was doing.  Officers informed Mr. Lopez-Sanchez that

he had the right to refuse to consent to a search.  Although a suspect need not be advised of such

a right to render his consent voluntary, *see United States v. Navarro*, 90 F.3d 1245, 1257 (7th

Cir. 1996); *Saadeh*, 61 F.3d at 518, the fact that Mr. Lopez-Sanchez was so informed only

strengthens the government's case.  No party suggests that Mr. Lopez-Sanchez was detained or

in custody before he consented to a search, or that officers coerced him physically.  And Mr.

Lopez-Sanchez consented to a search as soon as officers had clarified their request, their intent,

and what the search process entailed.

Defense counsel contends, though, that Mr. Lopez-Sanchez did not speak or understand

English well enough to render his consent voluntary.  However, U.S. Courts of Appeals have

repeatedly upheld consents to search by non-native English speakers under circumstances similar

to those of this case.  In *United States v. Garcia*, 897 F.2d 1413 (7th Cir. 1990), the Seventh

Circuit found that despite the defendant's contention to the contrary, his ability to speak and

understand English was clearly proven by his lengthy conversation with police officers over a considerable period of time. *Id.* at 1419. *See also United States v. Riascos-Suarez*, 73 F.3d 616, 625 (6th Cir. 1996) (overruled on other grounds) (finding the defendant's consent to search voluntary because he was able to respond to officers' questions in English); *United States v. Corral*, 899 F.2d 991, 994 (10th Cir. 1990) (same); *United States v. Rodriguez-Lara*, No. 2:08-CR-860, 2010 WL 681662, at *8 (D. Utah Feb. 23, 2010) (same). In *Navarro*, the Court found consent voluntary given "ample evidence" to support the conclusion that the Defendant spoke and understood English, including his long residency in the U.S. and his long employment in an English-speaking workplace. 90 F.3d at 1257. *See also United States v. Verduzco*, 996 F.2d 1220, at *3 (7th Cir. 1993) (unpublished table opinion) (considering the fact that the defendant had lived in the U.S. for several years). As the Fifth Circuit summarized in *United States v. Alvarado*, 898 F.2d 987 (5th Cir. 1990), "where there is sufficient conversation between the suspect and law enforcement officers to demonstrate that the suspect had an adequate understanding of English to fully comprehend the situation, a finding that consent was voluntary may be proper." *Id.* at 991. *See also United States v. Marquez*, No. 02-10024-01, 2002 WL 1284290, at *4 (D. Kan. May 16, 2002) ("The tape indicates that [the defendant] may not have understood at first what the trooper was asking, but he did understand the question after it was repeated and was very willing to let the trooper look in the truck.").

This case presents just such a situation. Ample evidence supports the conclusion that Mr. Lopez-Sanchez spoke and understood English sufficiently well to render his consent voluntary. As he told officers, Mr. Lopez-Sanchez had lived in the United States for 17 years at the time of the search. He stated that he had worked at Scott Brass for several years, until that business

closed.  He also chatted with officers about numerous topics, including neighborhood

construction and his sons' ages and activities.  Based on these conversations, Sergeant Reppert

testified that he believed that Mr. Lopez-Sanchez understood the purpose of the officers' visit

and his rights.

The fact that Mr. Lopez-Sanchez signed a written form giving officers consent to search

further bolsters the government's contention that Mr. Lopez-Sanchez consented voluntarily.  The

Seventh Circuit has repeatedly cited the fact that an individual signed a written form authorizing

a search as evidence that consent was given voluntarily, even where the individual's ability to

understand English was later disputed.  *See*, *e.g.*, *Navarro*, 90 F.3d at 1257; *Saadeh*, 61 F.3d at

518; *United States v. Duran*, 957 F.2d 499, 502 (7th Cir. 1992).  *See also United States v.*

*Mustapher*, 459 F. Supp. 2d 752, 758 (N.D. Ill. 2006) (holding that the defendant's adequate

understanding of spoken English made him fully capable of giving voluntary consent when he

signed the consent-to-search form, despite his limited understanding of written English).

Moreover, several of Mr. Lopez-Sanchez's nonverbal actions show that he understood

officers and voluntarily consented to a search.  *See United States v. Cotnam*, 88 F.3d 487, 495

(7th Cir. 1996) ("A person can, however, consent to the entry of their home or hotel by officers,

and consent need be neither express or verbal.").  In *United States v. Butkiewicz*, 51 F.3d 276

(7th Cir. 1995) (unpublished table opinion), the Court found voluntary consent where the

defendant told the police that it was "okay" to search his truck, and even opened the lock on the

truck's rear door to allow troopers to enter.  *Id.* at *4.  In *United States v. Bertucci*, 532 F.2d

1144 (7th Cir. 1976), the Court found voluntary consent established by evidence that the

defendant opened the rear door of his vehicle in response to a police request to examine cartons

7

contained therein. *Id.* at 1146. And in *Marquez*, the court found voluntary consent confirmed by the defendant's actions–when the trooper asked if the truck was unlocked, the defendant said "no", immediately retrieved the key, unlocked the door, and motioned with his hand for the trooper to go inside. 2002 WL 1284290, at *4.

Mr. Lopez-Sanchez's conduct in this case similarly reflects his understanding and demonstrates his consent to search. After giving officers permission to enter his house, he immediately volunteered that he had guns in his bedroom and informed officers where they were, as if anticipating that officers might find them in the course of a search. And when Captain Gebo asked Mr. Lopez-Sanchez if officers could search the truck in the garage, Mr. Lopez-Sanchez again gave verbal permission, said that the truck was unlocked, and removed his dog from the garage so that they could search in peace.

Under these circumstances, the Court concludes that Mr. Lopez-Sanchez's consent to search was voluntary.

## II. Withdrawing Consent to Search

Defense counsel argues that even if Mr. Lopez-Sanchez's initial consent to search were voluntary, he sought to withdraw his consent and terminate the search by stating on several occasions that he had to go pick up his uncle.

Because consent to a search is not an all-or-nothing proposition, "a person may limit or withdraw his consent to a search, and the police must honor such limitations." *United States v. Mitchell*, 82 F.3d 146, 151 (7th Cir. 1996); *United States v. Dyer*, 784 F.2d 812, 816 (7th Cir. 1986). "However, when a suspect does not withdraw his valid consent to a search before the illegal weapon or substance is discovered, the consent remains valid and the seized illegal item is

8

admissible." *Mitchell*, 82 F.3d at 151. "The standard for measuring the scope of a suspect's

consent ... is that of 'objective' reasonableness–what would the typical reasonable person have

understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S.

248, 251 (1991).

Some courts have held that once valid consent has been given, there must be an

"unequivocal act or statement of withdrawal" to effectuate withdrawal of the consent. *United

States v. Ross*, 263 F.3d 844, 846 (8th Cir. 2001); *United States v. Alfaro*, 935 F.2d 64, 67 (5th

Cir. 1991). *See also United States v. Lopez*, No. 05-CR-82, 2005 WL 3054015, at *6 (E.D. Wis.

Nov. 15, 2005) (citing this standard). In *United States v. Schmitt*, No. 05-CR-181, 2005 WL

2449627 (E.D. Wis. Oct. 3, 2005), the court found that the defendant did not withdraw his

consent to search even though he stated that he wanted to go to a singing engagement rather than

speak with the investigating officer, stated that he had to leave, asked the officer to come back at

another time, and, according to the defendant, moved to escort the officer out of the residence.

*Id.* at *4. Similarly, in *Ross*, the defendant's conduct did not amount to an "unequivocal act or

statement of withdrawal", even though he grew impatient, asked how much longer the search

would take, and stated that he needed to be on his way. 263 F.3d at 845-46. And in *Lopez*, the

suspect was held not to have withdrawn consent even though she internally harbored a desire for

the police to leave and may have expressed some desire for them to finish up their search so that

she could leave. 2005 WL 3054015, at *8. *But see United States v. Dichiarinte*, 445 F.2d 126,

128 (7th Cir. 1971) (finding consent withdrawn where the defendant exclaimed, "The search is

over. I am calling off the search."); *United States v. Bily*, 406 F. Supp. 726, 729 (E.D. Pa. 1975)

(finding consent withdrawn where the defendant stated, "That's enough. I want you to stop.");

*United States v. Ibarra*, 731 F. Supp. 1037, 1039-40 (D. Wyo. 1990) (finding consent withdrawn where the motorist closed and locked the trunk).

Here, Mr. Lopez-Sanchez's statements to officers about having to leave to pick up his uncle are just the sort of vague expressions of desire that courts have uniformly held insufficient to qualify as a withdrawal of consent. In sum, Mr. Lopez-Sanchez never asked officers to stop searching or to leave. Although he may have been impatient and may have wanted to pick up his uncle, he never even expressed any intent to leave or asked officers to expedite their search. In fact, the audio tape of the encounter confirms that he cooperated amicably with officers at all stages of their investigation. *See United States v. Shelton*, 70 F.3d 1275, at \*4 (7th Cir. 1995) (unpublished table opinion) (holding that the defendant's "consistently cooperative attitude belies any contention that his statements constituted a withdrawal of consent"). As a result, a reasonable officer on the scene would not have interpreted Mr. Lopez-Sanchez's conduct as a withdrawal of his consent to search.

## III. Seizure of the Shotgun

In determining whether police conduct violated the Fourth Amendment, the Court considers officers' actions objectively. As the Supreme Court held in *Devenpeck v. Alford*, 543 U.S. 146 (2004), "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Id.* at 153 (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)). In short, as long as an objectively lawful basis existed for Sergeant Reppert's seizure of the shotgun, his conduct was proper under

the Fourth Amendment, regardless of his actual thought processes.[2]

Here, three independent bases support Sergeant Reppert's removal of the shotgun from the truck. And once he removed and inspected the shotgun, it was subject to lawful seizure under the plain view doctrine.

## A. The Shotgun Was Evidence of Drug Activity

First, Reppert's seizure of the shotgun was proper because the shotgun qualified as evidence of "drug activity" for which Mr. Lopez-Sanchez explicitly granted officers consent to search.

Courts have often noted that firearms "are recognized as tools of the drug trade; thus, courts have sustained the admission of weapons evidence in narcotics cases because the possession of a weapon is often a hallmark of drug trafficking." *United States v. Duran*, 407 F.3d 828, 838 (7th Cir. 2005) (quoting *United States v. Hubbard*, 61 F.3d 1261, 1270 (7th Cir. 1995)). According to the Seventh Circuit, this connection stems from the fact that "the possession of a gun can advance the possession and future distribution of narcotics by protecting the drugs or the drug dealer." *United States v. Perez*, 581 F.3d 539, 547 (7th Cir. 2009); *accord United States v. Blanchard*, 542 F.3d 1133, 1141 (7th Cir. 2008) ("[T]he firearm is an indication of drug activity, and participation in drug trafficking supplies a motive for having the gun.") (quoting *Hubbard*, 61 F.3d at 1270)); *United States v. Bothun*, 424 F.3d 582, 586 (7th Cir. 2005) ("[G]uns found in close proximity to drug activity are presumptively connected to that activity.") (quoting *United States v. Corral*, 324 F.3d 866, 873 (7th Cir. 2003)); *United States v. Cooper*, 19

---

[2] At the suppression hearing, Reppert testified that he removed the shotgun in order to ensure officer safety during the search, as was his standard practice. *See* part III.C., *infra*.

F.3d 1154, 1163 (7th Cir. 1994) (holding that officers had probable cause to seize an empty ammunition box because when "[c]oupled with the seized drugs, weapons, and photographs, the ammunition box is probative of the use of weapons in connection with drug trafficking in violation of federal law").

Here, Reppert's seizure of the shotgun was proper, since the shotgun was evidence of drug activity and therefore was within the scope of the search. According to the audio tape of the search and Mr. Lopez-Sanchez's interview, officers believed that Mr. Lopez-Sanchez had driven other individuals on errands that included drug trafficking. This suspicion prompted officers to seek consent to search Mr. Lopez-Sanchez's house and vehicles. Although Mr. Lopez-Sanchez volunteered to officers that he had guns in his bedroom when consenting to a search of his home, he did not mention any firearm when consenting to a search of his vehicles. But in the course of searching his truck, Sergeant Reppert saw what he believed to be a firearm under the rear seat. Given the oft-cited nexus between guns and drug trafficking, the fact that the alleged trafficking took place in one of Mr. Lopez-Sanchez's trucks, and the fact that Mr. Lopez-Sanchez omitted mention of the shotgun in the truck, Sergeant Reppert had probable cause to believe that the shotgun was evidence of drug activity as soon as he saw it. As a result, he was justified in removing it for closer inspection.

However, this reasoning permitting officers to seize firearms does not apply with equal force when officers are investigating offenses not involving drug activity. For example, in *United States v. Gray*, 484 F.2d 352 (6th Cir. 1973), the court held that officers searching a residence for evidence of an alleged moonshine operation could not write down rifle serial numbers to see if they were registered. Similarly, in *United States v. Savides*, 664 F. Supp. 1544

(N.D. Ill. 1987), the court held that officers could not write down handgun serial numbers when

they were present only to search a residence for evidence of an illegal gambling operation. *Id.* at

1549.  In *United States v. Szymkowiak*, 727 F.2d 95 (6th Cir. 1984), the court concluded that

officers searching for stolen jewelry and a television set seized rifles unlawfully because they

had no reason to suspect they were fully automatic before they disassembled them. *Id.* at 99.

And in *Perry v. Sheahan*, 222 F.3d 309 (7th Cir. 2000), the Court held that officers enforcing an

eviction order did not have probable cause to believe that firearms were linked to criminal

activity, and therefore could not lawfully seize them. *Id.* at 316-17.  But when officers search for

evidence of drug activity, courts have upheld the seizure of otherwise legal weapons found. *See*,

*e.g.*, *United States v. Lowe*, 389 F. App'x 561, 561 (7th Cir. 2010) (upholding the seizure of

firearms by officers searching for evidence of cocaine trafficking); *United States v. Wayne*, 903

F.2d 1188, 1196 (8th Cir. 1990) ("The connection between drug activity and the weapons,

communication equipment, and grinder, was readily apparent to the experienced officers

executing the search and, therefore, their seizure was proper under the Fourth Amendment.").

### B. The Shotgun Could Have Concealed Drugs

Second, the shotgun was within the original consent to search because Sergeant Reppert

could have picked up the shotgun to search for drugs concealed behind it or even within the

shotgun itself.

"A consensual search is manifestly reasonable so long as it remains within the scope of

the consent." *United States v. Torres*, 32 F.3d 225, 230 (7th Cir. 1994) (quoting *United States v.*

*Martinez*, 949 F.2d 1117, 1119 (11th Cir. 1992) (citing *Florida v. Jimeno*, 500 U.S. 248, 249

(1991))).  The Seventh Circuit has held that "[p]ermission to search a specific area for narcotics .

13

. . may be construed as permission to search any compartment or container within the specified

area where narcotics may be found." *Id.* at 231. And "the Supreme Court has specifically

rejected the argument that the police must separately request permission to search each closed

container within a car." *Id.* at 231 (citing *Jimeno*, 500 U.S. at 251). *See also United States v.*

*Ross*, 456 U.S. 798, 820-21 (1982) ("A lawful search of fixed premises generally extends to the

entire area in which the object of the search may be found and is not limited by the possibility

that separate acts of entry or opening may be required to complete the search."); *United States v.*

*Young*, 38 F.3d 338, 340 (7th Cir. 1994) ("A search of an automobile based on probable cause

lawfully extends to all parts of the vehicle in which contraband or evidence could be concealed,

including closed compartments and trunks.").

For example, in *United States v. Wayne*, 903 F.2d 1188, 1196 (8th Cir. 1990), the Eighth

Circuit held that officers searching for drugs did not exceed the scope of their warrant when they

picked up and inspected a firearm, since the firearm itself could have contained drugs. That

Court quoted the district court's observation approvingly:

> [C]ocaine itself is easily hidden, and so the warrant would have authorized the
> officers to search every nook and cranny of the house, including any container in
> which such a small amount of cocaine could be found. Consequently-even to this
> extent, such a quantity of cocaine could have been hidden in the clip of a weapon,
> a pistol, or might even have been small enough to have been located in the barrel of
> such a weapon and hidden there, and so because the warrant authorized the officers
> to look for such a small amount of cocaine and the ease with which the cocaine can
> be hidden, the officers would have had the authority to pick up and examine any
> weapons they came across.

*Id.*

Of course, when the reason for an officer's presence does not give rise to a lawful right of

access to a weapon, officers may not examine it more closely. For example, in *United States v.*

*Koepnick*, Nos. CR-09-065; CR-09-064, 2009 WL 2591683 (D. Idaho Aug. 20, 2009), an officer

conducting a consent search to locate a fugitive saw only the handle of a shotgun protruding

from a stack of laundry. *Id*. at *6. The court concluded that he did not have probable cause to

remove the shotgun to examine it more closely, because the object of his search–a fugitive–could

not have been located in the stack of laundry and the length of the firearm's barrel was not

visible as it lay. *Id.*

　　　In this case, though, officers obtained Mr. Lopez-Sanchez's consent to search his truck

for evidence of drug activity. Mr. Lopez-Sanchez's consent extended to "any compartment or

container within the specified area where narcotics may be found", *Torres*, 32 F.3d at 231,

including within any weapons large enough to contain drugs. Reppert testified that he had

previously found drugs hidden in spare tires, in glove boxes, under floor mats, in seat cushions,

in sun visors, and even in Chapstick containers. Officers were therefore also justified in

removing the shotgun from its resting place in order to search its breech and barrel, which could

have contained drugs. Additionally, in order to complete a search of the area under the truck's

rear seat, officers would have needed to move the shotgun to ensure that drugs were not located

behind it. Sergeant Reppert therefore was entitled to move the shotgun, and, in doing so, to

examine it.

## C. Officer Safety Justified Securing the Shotgun

　　　Finally, Sergeant Reppert's removal of the shotgun from the truck was justified to ensure

officers' safety as they searched.

　　　Numerous cases have upheld the temporary securing of dangerous weapons during the

course of an investigation. In *United States v. Malachesen*, 597 F.2d 1232 (8th Cir. 1979), the

Eighth Circuit explained, "Although the incriminating nature of the handgun may not have been immediately apparent to the investigating officers, its temporary seizure, unloading, and retention by a responsible officer . . . seems a reasonable precaution to assure the safety of all persons on the premises during the search." *Id.* at 1234. In *United States v. Rodriguez*, 601 F.3d 402 (5th Cir. 2010), the Fifth Circuit upheld officers' temporary seizure of a shotgun found in the course of investigating a domestic disturbance. *Id.* at 408 (citing *United States v. Bishop*, 338 F.3d 623, 628-29 (6th Cir. 2003); *United States v. Timpani*, 665 F.2d 1, 5 n.8 (1st Cir. 1981)). And in *United States v. Antwine*, 873 F.2d 1144 (8th Cir. 1989), the Eighth Circuit read *New York v. Quarles*, 467 U.S. 649 (1984), to imply that a warrantless seizure of a weapon "may be considered 'reasonable' within the meaning of the Fourth Amendment when justified by an officer's legitimate concern for someone's safety." *Id.* at 1147. *See also Coolidge v. New Hampshire*, 403 U.S. 443, 472 (1971) (holding that the plain view exception permits the warrantless seizure of "objects dangerous in themselves"); *United States v. Williams*, 495 F.3d 810, 815 (7th Cir. 2007) (holding that police may take weapons from a car in the interest of public safety when they have been left lying about unattended) (citing *United States v. Wilson*, 2 F.3d 226, 233 (7th Cir. 1993)); *United States v. Arcobasso*, 882 F.2d 1304, 1307 (8th Cir. 1989) (holding that "the weapons were properly unloaded and seized as a precaution to assure [officers'] safety and that of any other individual who might have been present"); *United States v. Pillow*, 842 F.2d 1001, 1004 (8th Cir. 1988) (finding lawful the seizure of a gun in plain view as a reasonable safety precaution); *United States v. Brydon*, No. CR04-0103, 2005 WL 1221433, at *5 (N.D. Iowa May 20, 2005) (same).

This precedent supports Sergeant Reppert's removal of the shotgun from Mr. Lopez-

Sanchez's truck.  After opening the rear, driver's-side door of the truck, Reppert testified that he saw the shotgun's handle protruding from under the rear seat, with its handle pointed toward him.  He also testified that Captain Gebo was searching the rear passenger's-side area of the vehicle.  This would mean that the shotgun was aimed in Captain Gebo's general direction.  Given that a shotgun is a dangerous weapon no matter the length of its barrel, it seems inarguable that removing the shotgun from the truck during the duration of the search and ensuring that it was unloaded would be reasonable precautions to ensure the safety of officers as they searched.  Sergeant Reppert testified that his standard practice was to secure firearms for safety, and that this was the reason he picked up the shotgun during the search.  Under relevant precedent, his removal of the shotgun from the truck was proper.

## IV. Plain View Seizure

Once the shotgun was removed from the truck for any of the three reasons detailed above, its seizure would be proper under the plain view doctrine.  That doctrine permits an officer to seize an item if: "(1) the officer was lawfully present in the place from where he viewed the item, (2) the item was in plain view, and (3) its incriminating nature was 'immediately apparent.'"  *United States v. Cellitti*, 387 F.3d 618, 623 (7th Cir. 2004) (citing *United States v. Raney*, 342 F.3d 551, 558-59 (7th Cir. 2003)).  "For the incriminating nature to be immediately apparent, the officer must have probable cause to believe that the item is contraband or otherwise linked to criminal activity."  *Id.* (citing *United States v. Bruce*, 109 F.3d 323, 328 (7th Cir. 1997)).

The "immediately apparent" standard does not require that a "police officer 'know' that certain items are contraband or evidence of a crime."  *Texas v. Brown*, 460 U.S. 730, 741 (1983).

Rather, it requires "probable cause to associate the property with criminal activity." *Id.* at

741-42 (quoting *Payton v. New York*, 445 U.S. 573, 587 (1980)). Probable cause demands not

that an officer be "sure" or "certain" but only that the facts available to a reasonably cautious

man would warrant a belief "that certain items may be contraband or stolen property or useful as

evidence of a crime." *Id.* at 742. Indeed, the Supreme Court has recognized that "the phrase

'immediately apparent' was very likely an unhappy choice of words, since it can be taken to

imply that an unduly high degree of certainty as to the incriminatory character of evidence is

necessary for an application of the 'plain view' doctrine." *Id.* at 741-42 (quoting *Payton*, 445

U.S. at 587).

Courts have repeatedly upheld the seizure of firearms that reasonably appeared

unlawfully short to officers. *See*, *e.g.*, *Rodriguez*, 601 F.3d at 408 ("Once seized for [officer

safety while searching], the incriminating nature of the weapon became apparent and it was then

subject to permanent seizure as contraband."); *United States v. Wade*, 30 F. App'x 368, 372 (6th

Cir. 2002) ("[F]or purposes of the plain view doctrine, the immediately apparent intrinsically

incriminating characteristic of a sawed-off shot gun is the length of the barrel. That

characteristic alone provides probable cause for a police officer to believe that the weapon is

illegally possessed."); *United States v. Wickizer*, 633 F.2d 900, 902 (6th Cir. 1980) (holding that

short-barreled rifles were "obviously contraband" and properly seized when found in plain

view); *United States v. Truitt*, 521 F.2d 1174 (6th Cir. 1975) (upholding seizure of a sawed-off

shotgun because, according to the district court, "it is a matter that is pretty common knowledge,

sawed-off shotguns are not used by the average law abiding citizen of this community"); *United*

*States v. Zeidman*, 444 F.2d 1051, 1053 (7th Cir. 1971) (holding that the length of a firearm's

barrel gave officers probable cause to seize it); *Porter v. United States*, 335 F.2d 602, 607 (9th Cir. 1964) ("[A] sawed-off shotgun in private hands is not an intrinsically innocent object. The possession of it is a serious crime, except under extraordinary circumstances.").

Here, upon his inspection of the shotgun, Sergeant Reppert testified that he believed that its barrel was unlawfully short. At the suppression hearing, he stated that he was 60 percent sure of that suspicion when he first handled the weapon. He confirmed this belief with his fellow officers, who concurred that the shotgun's barrel was too short. On the audiotape of the search, officers are recorded telling Mr. Lopez-Sanchez, correctly, that shotgun barrels must be 18 inches long for the weapon to be legal. *See* 26 U.S.C. § 5845(a). Accordingly, Sergeant Reppert had probable cause to believe that Mr. Lopez-Sanchez's possession of the shotgun was unlawful, which permitted him to seize it lawfully.

### Conclusion

In sum, the government has proved by a preponderance of the evidence that Mr. Lopez-Sanchez's Fourth Amendment rights were not violated during the consent search of his house and truck. Accordingly, the Defendant's motion to suppress [DE 23] is hereby DENIED. All pretrial deadlines will be reset by a supplemental scheduling order.

SO ORDERED.

ENTERED:  August 4, 2011

 /s/ JON E. DEGUILIO
Judge
United States District Court

19